[No. A042894. First Dist., Div. Five. June 27, 1991.]

UNION PACIFIC RAILROAD COMPANY et al., Plaintiffs and Appellants, v.
STATE BOARD OF EQUALIZATION et al., Defendants and Appellants.

**COUNSEL**

Crosby, Heafey, Roach & May, Jay R. Martin, Peter W. Davis, John E. Carne and M. Reed Hunter for Plaintiffs and Appellants.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Robert F. Tyler, James B. Cuneo, Edward P. Holligshead, Robert D. Milam, Deputy Attorneys General, Louise H. Renne, City Attorney, John J. Doherty, Deputy City Attorney, Steven M. Woodside, County Counsel and Karen E. Heggie, Deputy County Counsel, for Defendants and Appellants.

**OPINION**

**LOW, P. J.**—In this case we review the methods used by the State Board of Equalization (the Board) to assess railroad operating assets. We conclude, as did the superior court, that the Board's "composite life" model cannot legally be applied to railroad operating property. We also hold, however, that the

superior court erred in finding illegal certain Board techniques for estimating current railroad income.

Several railroad companies (the Railroads)[1] brought these consolidated actions for refund of property taxes paid in 1978, 1979, and 1980. (Cal. Const., art. XIII, § 32; Rev. & Tax. Code, §§ 5140-5148.)[2] Defendants are the Board, which assessed the property, and numerous counties and cities which collected taxes on it.[3] The trial court found the Board had employed an invalid method of valuation and that certain Board procedures had deprived the Railroads of due process. The court remanded for the Board to recalculate the values, employing changes in methodology specified by the court. After a return by the Board the court ordered refunds in amounts drawn from the Railroads' petitions for reassessment, claims for refund and complaints, because those refunds were smaller than those calculated by the Board on remand.

*Procedural Background*

After the tax lien date, March 1 of each year, the Board's valuation staff prepares and presents to the Board an "appraisal data report" for each taxpayer. For this report the staff calculates several different "value indicators" and makes a value estimate on the basis of those indicators. The Board also meets with taxpayers for the presentation of the taxpayers' views on valuation. In late May the Board, in a public meeting, sets the values for each taxpayer's property. A valuation notice is sent to the taxpayer; the staff report is usually attached to this notice. The Railroads, in each year at issue here, then petitioned for reassessment. After hearings, if requested by the Railroads, those petitions were denied with appropriate findings by the Board. The Railroads then paid the taxes, filed claims for refunds, and on their denial brought these actions.

*The Board's Valuation Method*

The Board's primary approach to valuation of these properties was the "income" or "capitalized earnings ability" approach. The income approach estimates current fair market value of a property by attempting to determine

---

[1]The Railroads are Union Pacific Railroad Company, Burlington Northern, Inc., and Western Pacific Railroad Company. A fourth plaintiff, The Atchison, Topeka and Santa Fe Railway Company, settled its claim and has been dismissed from this appeal.

[2]All further statutory references are to the Revenue and Taxation Code unless otherwise specified.

[3]All of the local governments, except for the City and County of San Francisco (San Francisco), have joined in the briefs of the Board rather than filing separate briefs. San Francisco joins in the Board briefs but has filed additional briefs addressing a procedural issue.

the amount that an investor would be willing to pay for the right to receive the future income the property is projected to produce. (Cal. Code Regs., tit. 18, § 3, subd. (e).) It is frequently summarized by the formula V = I/R, where V is the estimated value of the property, I is the projected future income, and R is a capitalization rate by which the present value of the income stream is determined. The Railroads agree that this is the best general approach for valuing railroad operating assets. The central disputes between the Railroads and the Board concern the size of the income stream, in particular, whether the costs of replacing track and rolling stock should be deducted as expenses, and the length of the stream, i.e., whether it should be projected as a perpetuity or a limited lifetime.

The Board projects income only for a limited lifetime, calculated as a "composite" lifetime of the existing team of tangible assets. It does not deduct from the income to be capitalized the cost of replacing those assets in kind. (General operating expenses, including "spot" maintenance of track, *are* deducted from the income to be capitalized.) The Board projects a level (neither rising nor falling) income over the composite life of the assets. The Board acknowledges that revenue attributable to the aging assets would actually decline over their lifetime, but, in the Board's composite life model, revenues attributable to the longer lived assets are averaged with those attributable to the shorter lived, producing a level income for the composite lifetime. The present value of that income stream is calculated, and the estimated value of the land, which has a perpetual life, is then added.

The Board computed two different values for each property, the first using as the income base the income in the past year, the second using an average of the previous five years' incomes. Before averaging the previous years' incomes, the Board, in 1979 and 1980, adjusted them to current dollars according to increases in the consumer price index (CPI). Regulatory rate increases added during or after the income reporting year, and therefore not fully reflected in the reported revenues, were also added to revenues, with a proportionate adjustment to expenses.

The composite lifetime of the existing assets is an average of the remaining lifetimes of the assets, weighted by their replacement costs. A "capital recovery factor," computed from the composite life, is added to the basic capitalization rate, to account for an investor's need to recover its investment during the limited lifetime. By increasing the denominator of I/R, this has the effect of decreasing the estimated value of the property below what would be reached if the same income were projected over a perpetual life.

The Railroads claim the Board's composite life model is inherently unsuitable for appraisal of railroad properties, which they argue require constant replacement of track structure and rolling stock simply to maintain operating income. They successfully argued below that the Board should be required to use a perpetual life model and to deduct, from income to be capitalized, the costs of replacing assets in kind. The trial court ordered the Board to make the following changes in its income approach valuations:

"1. [Use] the perpetual life model and [deduct] expenditures for track replacement in kind from the income to be capitalized . . . ;

"2. [Deduct] from income to be capitalized the capital expenditures for replacement of rolling stock and other equipment in an amount . . . equal to the book value depreciation . . . ;

"3. [Omit] the adjustment of income to be capitalized by the Consumer Price Index (CPI);

"4. [Omit] the adjustment to income to be capitalized for prospective rate increases;

"5. [Omit] any capital recovery factor from the capitalization rate."

I

*Standard of Review and Introduction of New Evidence in the Superior Court*

The superior court denied the Board's motion *in limine* which sought exclusion of any evidence regarding application of the Board's valuation method beyond that contained in the administrative record. The court heard extensive expert testimony from both parties regarding the correctness of various valuation methods, including that employed by the Board. After trial the court concluded that the disputed issues were legal, not factual, and were therefore to be determined de novo. The Board contends that there were disputed issues of fact as to which no new evidence should have been introduced and which should have been reviewed only under a substantial evidence test.

 The standard and scope of superior court review depend on the nature of the taxpayer's challenge to the assessment. When the taxpayer claims only that the assessor has erroneously applied a valid method, review is restricted to the administrative record and is limited to determining

whether the assessment board's decision was supported by substantial evidence. (*Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14, 23 [127 Cal.Rptr. 154, 544 P.2d 1354].) When the challenge is to the validity of a valuation method itself, however, the question for the superior court is one of law, i.e., whether the method employed was arbitrary, in excess of discretion, or in violation of legal standards. (*Ibid.*) In determining this legal question, the superior court is not restricted to the administrative record but may take additional evidence as needed. (*Trailer Train Co.* v. *State Bd. of Equalization* (1986) 180 Cal.App.3d 565, 582 [225 Cal.Rptr. 717]; *Georgia-Pacific Corp.* v. *County of Butte* (1974) 37 Cal.App.3d 461, 474 [112 Cal.Rptr. 327].)[4]

A valuation method may be recognized as theoretically coherent and logical, yet be so inappropriate to the type of property being assessed as to ensure, for all properties of that general kind, that the results reached will not approximate fair market value. A claim of this kind could be termed a challenge to the "application" of the method, presenting a factual question. ■ But where the claim is that, due to the basic undisputed characteristics shared by an entire class of properties, the challenged method will produce systematic errors if applied to properties in that class, the issue is not factual but legal. The issue is not whether the assessor misunderstood or distorted the available data, but whether he or she chose an appraisal method which by its nature was incapable of correctly estimating market value.

An example is found in *Southern Pacific Transportation Co.* v. *State Bd. of Equalization* (1987) 191 Cal.App.3d 938 [237 Cal.Rptr. 191]. There the railroad contended that the Board's use of historical and reproduction cost approaches was improper because certain characteristics of the railroad industry as a whole (functional and economic obsolescence, overimprovement and legal restrictions on income unrelated to cost) made the cost approaches invalid for use on railroad properties. (*Id.*, at pp. 945, 958.) The court held this presented a legal, not a factual question, because the characteristics purportedly making the cost approaches inappropriate were neither disputed nor peculiar to Southern Pacific's property. The issue was whether, because of undisputed characteristics of the railroad industry as a whole, the cost measures were inherently unreliable when applied to railroads. "This is plainly a legal question, ultimately for the courts to resolve." (*Id.*, at p. 956.)

---

[4]Section 5170, which provides that in suits for refund of state-assessed taxes the trial court is not limited to the administrative record but may consider all admissible evidence bearing on valuation, came into effect in 1989, after the trial of these actions, and has no application here.

The Railroads' essential claim in this case, like that in *Southern Pacific*, is that the valuation methods employed by the Board, even where theoretically coherent, are fundamentally inappropriate for the assessment of railroad operating assets. In its 1980 petition for reassessment, for example, Union Pacific argued that while the staff's limited life model "is theoretically plausible for some properties," it improperly ignores the regulations requiring railroads to "spend funds sufficient to maintain the operating service level of the railroad." In another contention the Railroads claimed that the Board model, which assumed a level income for a limited life without replacement of assets, was inherently unrealistic because "these assets are so highly integrated, so inter-dependent, that the removal of part of the asset will destroy the whole system, or at least destroy the ability of that system to earn money."

Both of the identified characteristics, legally mandated reinvestment and interdependence of assets, are characteristics of the industry as a whole rather than of any particular railroad. There was essentially no dispute as to the existence of these factors in the industry. In determining whether such industrywide factors rendered the Board's chosen valuation method invalid, the superior court decided a legal question. The trial court did not err in admitting additional evidence on the validity of the Board's methods and in deciding the primary question of validity de novo.

## II

*Does the Board Model Violate Its Own Regulation?*

The Board has promulgated rules for the assessment of property which broadly delineate the techniques to be used. Section 8 of title 18 of the California Code of Regulations (hereafter Rule 8) describes the income approach to valuation. Rule 8, subdivision (c) provides: "The amount to be capitalized is the net return which a reasonably well informed owner and reasonably well informed buyers may anticipate on the valuation date that the taxable property existing on that date will yield under prudent management and subject to such legally enforceable restrictions as such persons may foresee as of that date. Net return, in this context, is the difference between gross return and gross outgo. Gross return means any money or money's worth which the property will yield over and above vacancy and collection losses, including ordinary income, return of capital, and the total proceeds from sales of all or part of the property. Gross outgo means any outlay of money or money's worth, including current expenses and capital expenditures (or annual allowances therefor) required to develop and maintain the estimated income. Gross outgo does not include amortization,

depreciation, or depletion charges, debt retirement, interest on funds invested in the property, or rents and royalties payable by the assessee for use of the property. Property taxes, corporation net income taxes, and corporation franchise taxes measured by net income are also excluded from gross outgo."

■ The Railroads contend, and the trial court concluded, that the Board model violates Rule 8, subdivision (c) because it fails to include in gross outgo the capital expenditures (costs of replacement in kind) necessary to maintain the estimated income.

Rule 8, subdivision (c) does not disallow the Board's method of computing net return. Rule 8, subdivision (b) specifically allows the use of a limited life model, and when a limited life model is used Rule 8, subdivision (c) must be read as requiring only the deduction of capital expenditures needed to maintain the estimated income for the limited lifetime.[5] The Board's composite life model, a variant of the limited life technique, is not disallowed by Rule 8, subdivision (b), and subdivision (c) must be given an interpretation which makes sense when applied to the composite life model.

In the Board model the estimated income is projected to last only as long as the original assets (averaged by replacement cost). The fact that some assets have relatively short lives, and would in the normal course of business need to be replaced frequently to maintain the income for any substantial period, is taken into account by a corresponding shortening of the composite life. By hypothesis, the model requires *no* capital expenditures to maintain the estimated income, because the estimated income is only that attributable to the original assets, not that attributable to their capital replacements.

The author of Rule 8, Ronald Welch, opined that a composite life method was permissible under the rule. According to Welch, the amount of "capital expenditures" referred to in Rule 8, subdivision (c) depends upon, among other variables, the duration of life being projected. Welch further testified that the use of a capital recovery factor in the denominator (that is, in the capitalization rate) was a permissible way, under Rule 8, to shorten the lifetime and provide for the return of the investor's capital. Where a

---

[5]Rule 8, subdivision (b) provides in part: "In practical application, the [estimated income] stream is usually either [¶] (1) divided into . . . segments, such as the estimated economic life of the improvements and all time thereafter or the estimated economic life of the improvements and the year in which the improvements are scrapped and the land is sold, or [¶] (2) divided horizontally by projecting a perpetual income for land and an income for the economic life of the improvements, or [¶] (3) projected as a level perpetual flow."

The Board's method was of the type described in Rule 8, subdivision (b)(1).

composite life model is used, Welch stated, Rule 8, subdivision (c) does not call for deduction of capital expenditures from the numerator (that is, from the income): "The use of the composite life, as long as it relates to all of the depreciable assets, takes the place of the deduction or non-deduction, I should say, of the capital outlays, capital expenditures referred to in 8(c)."

The Board model includes neither the future income beyond the composite lifetime nor the capital expenditures required to develop and maintain that income; the two are assumed to "cancel" each other. By definition, the capital expenditures required to maintain estimated income equal zero under the composite life model. This does not constitute a violation of Rule 8, subdivision (c); nothing in the rule suggests that every factor mentioned must have a nonzero value for every property and under every technique employed. To the contrary, the rule is general in nature and must be adapted to the details of the particular techniques employed.

### III

*Is the Board Method Inherently Unreliable When Applied to Railroad Properties?*

The Railroads argue, and the trial court concluded, that the composite life/no replacement cost model depends on assumptions which are so unrealistic when applied to railroad properties as to ensure that the value estimate will be unreliable.

Certain "assumptions" identified by the Railroads are not actually assumptions of the model, but simply limitations on its scope. Although the Board does not deduct from income the cost of capital replacements in kind, its model does not rest on an assumption that no such replacements will be made, as the Railroads claim. Rather, the assumption is that those replacements, if they are added, will produce new income streams sufficient to balance their cost. The Board model estimates the value of only those assets actually existing on the lien date; both the cost of future replacements and the income they will produce are ignored.

Similarly, it is not assumed that the railroad will actually allow its income to decline to zero as the existing assets age; rather the model contemplates a continually changing allocation of income as new assets replace the old, until at the end of the limited life no remaining income is attributable to the old assets. Nor does the Board actually assume income will remain level over the composite lifetime if no replacements are made; as already

described, the Board model mathematically averages a hypothetical declining income over a longer period into a level income over a shorter period.

Finally, a limited life model such as the Board used does not rest on the assumption that the operating company will go out of business at the end of that lifetime. The model is merely *limited* to projecting the income during that period; it *assumes* that both the income to be generated later and the cost of acquiring the assets to generate such income may be ignored because they will cancel each other.

Because neither a level income for the composite life nor a cessation of operations at the end of that life are intended to be realistic assumptions of the composite life model, we do not agree with the criticisms made of similar models in *Soo Line R. Co. v. Wis. Dept. of Rev.* (1978) 89 Wis.2d 331 [278 N.W.2d 487] (affd. (1980) 97 Wis.2d 56 [292 N.W.2d 869]) and *Burlington Northern, Inc. v. Dept. of Revenue* (1981) 291 Ore. 729 [635 P.2d 347]. The *Soo Line* court found a limited life model inappropriate for a railroad because "the Interstate Commerce Commission will not allow Soo Line to abandon its business." (278 N.W.2d at p. 495.) In *Burlington Northern* the court disapproved a composite life model because it assumed "the noncontinuation of the enterprise beyond 19 years," and because the court had "serious reservations as to the assumption that the income stream would continue at a constant level" without replacement of the capital assets. (635 P.2d at p. 353.) The analyses in these cases are superficial, because a limited life model does not actually assume the business will be abandoned at the term's end, and a composite life does not actually assume level income over the life.

All mathematical models used for valuation of property employ simplifying techniques which, if viewed as assumptions about actual operations, may be unrealistic. The Railroads' perpetual life model, for example, "assumes" that each railroad will operate forever and will have, for eternity, exactly the same levels of revenue, expenses and capital replacement costs as it currently enjoys. There was no testimony that such expectations are realistic.

As Board expert Bradford Cornell testified, the present value of actual cash flows projecting into the very long term "depends on both replacement policy and on new investments[,] on the inflation rate; and, most importantly, what the rate of return is going to be on the new invest[ments] . . . not only tomorrow and the next day, but into the distant future." He testified that the best projections of such actual future income would require knowing the Railroads' own future investment and income projections as disclosed in

their strategic planning documents, yet the Board has been denied access to strategic plans, on the ground that future investments and the resulting income are irrelevant to valuation of existing assets. (*Union Pacific R.R. Co. v. State Bd. of Equalization* (1989) 49 Cal.3d 138, 147-149 [260 Cal.Rptr. 565, 776 P.2d 267].) According to the Board expert, the perpetual life model is more sensitive to assumptions about those future parameters than the fixed life, and hence more prone to errors when those parameters are not known.

The Railroads' model simplifies the future by "assuming" that existing assets will be exactly replaced, and that the system will continue to produce the same net income. The Board's model simplifies the future by leaving out both possible replacement costs and the income they could produce. Both "assumptions" have as their goal the valuation solely of existing assets, and neither is inherently more realistic than the other.

The Board model does, however, rest on a central assumption which was shown to be unsupported and untestable: that future capital replacements will, in general, earn at least their capital costs. The principal appraiser for the Board explained, "[W]e assume that each asset, in essence, pays its own way." Board expert witness Cornell conceded that if replacement assets do not earn their costs, the fixed life model would overestimate value.

The only support given for the Board's key assumption was theoretical: a company's management, acting rationally, would not make investments (whether additions or replacements) which would reduce the value of the company by earning less than their cost of capital. In other words, it was assumed that investments in replacements would be discretionary with future management, and would not be made if they would not earn enough to justify the cost.

The assumption of full discretion in reinvestment was, however, shown to be incorrect for the railroad industry. Railroad lines cannot be abandoned or neglected without the approval of federal and state regulatory agencies. Because of safety concerns and regulations, a line cannot be maintained at the same service level without periodic replacement of track structure. Abandonment requires a Interstate Commerce Commission finding of public convenience and necessity, a decision which, according to the Railroads' witness, Paul Cunningham, is partly economic and partly political. Cunningham testified that in some instances regulators have required investments to maintain an asset even where that asset can be expected to earn almost nothing in return. Railroad witness Clifford Fitzgerald testified that railroads

have "chronic[ally]" exhibited financial conditions which suggest their assets are not earning their cost of capital.

There was also expert testimony that, because of the integrated nature of railroad assets, the assumption that all future replacements would earn their cost of capital was either wrong or untestable. It is difficult or impossible to determine, in an integrated system, whether a replacement asset would earn its cost of capital. When the income with the replacement is compared to that without, the return on cost of replacement will appear high, but that is because income from all or a large portion of the system is being attributed to the single asset. In that circumstance a rational manager would make the replacement even though the system as a whole may be earning an inadequate return on capital. Board witness Cornell conceded that for a fully integrated system the fixed life model would be "misleading," and he was "not sure" whether it would work correctly on a partially integrated system. Railroad witnesses Arthur Schoenwald and Fitzgerald testified that any degree of integration would introduce error into a fixed life model and that railroad operations were integrated "[t]o an extreme degree."

Because of these two characteristics of the industry—mandated reinvestment and economic integration of assets—it was incorrect to assume, as the Board did, that future investment in replacements would always "pay their own way." The Board has conceded that its model rests on that assumption, and lacking support for the assumption, the Board legally erred in using the composite life model. The first, second and fifth changes ordered by the trial court correct this error and will be affirmed.

IV

*Were the Board's Measurements of Current Income Incorrect?*

The trial court ordered the Board to stop adjusting past years' income by the CPI when estimating current income by a five-year average. We conclude this aspect of the court's decision was erroneous.

Board witnesses consistently testified that the CPI adjustment of past years' income was performed simply in order to express all the years' income in terms of a constant purchasing power, and did not constitute a projection of future income growth. The Board projected future income as level, not increasing. Yet the trial court concluded that the adjustment was erroneous because the Railroads' "future net cash flow is not expected to increase despite any inflation." The court based its conclusion on testimony from the Railroads' witness, Schoenwald, to the effect that railroads in

general are a "no growth" industry in which returns have not historically kept pace with inflation. Schoenwald also testified that a CPI adjustment to past income should not be made unless it was shown that railroad income increased with inflation. The basis for this opinion, however, was never explained.

Whether or not future income can be expected to increase at the rate of inflation, it remains true that a dollar earned in 1975 was worth more, in purchasing power, than a dollar earned in 1979. If incomes for those years were averaged without adjustment, the resulting number would be meaningless as a measurement of 1979 income value. If the goal is to find the value of future income based on an estimate of current income, all the dollar figures used to find current income must, logically, be expressed in terms of constant value. This requires indexing by some measure of past inflation, for which the CPI is an unsurprising choice.

The trial court also ordered the Board not to increase current income by the amount of rate increases granted during the appraisal year. The court relied on Schoenwald's testimony that rate increases were often not passed through in full because of competition and that by the time increases were implemented new expenses had also arisen, amounting to 80 or 90 percent of revenues rather than the 60 percent used by the Board in its calculations. The extent to which increases are likely to be passed through, and the most accurate ratio of expenses to new revenue, are not matters of law to be decided by the court, but factual issues for resolution primarily by the Board and its staff. (*Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* 16 Cal.3d at p. 23.) The court found no substantial evidence in the administrative record supporting the Board figures, and the Board has directed us to none. Nonetheless, the facts were not undisputed, and the court should not have substituted its own factual judgment but should rather have remanded to the Board for determination of the question. (*Kaiser Center, Inc.* v. *County of Alameda* (1987) 189 Cal.App.3d 978, 982-983 [234 Cal.Rptr. 603].)

V

*Were the Railroads Deprived of Procedural Due Process?*

The trial court determined the Board procedures were constitutionally inadequate or unfair in these respects: (1) failure to adhere to a predominance-of-the-evidence standard at reassessment hearings; (2) the lack of a quorum during the taking of evidence; (3) the same attorney acted as advocate on behalf of the Board's initial assessment and as adviser to the

Board in its quasi-judicial capacity, resulting in ex parte communications during the pendency of the petitions for reassessment. The court, however, did not remand for new hearings on the reassessment petitions; instead, it determined that the correct methods and values could be fixed from evidence already in the record, and remanded only for the recalculation of values under correct methodology. The final judgment of the court did not include any declaratory or injunctive relief requiring alteration of Board procedures.

Because the trial court's conclusions regarding due process were not necessary to any of the relief ordered, we do not need to determine their correctness in order to affirm or reverse. (See *Pas* v. *Hill* (1978) 87 Cal.App.3d 521, 524, fn. 2 [151 Cal.Rptr. 98], overruled on other grounds in *Saucedo* v. *Mercury Sav. & Loan Assn.* (1980) 111 Cal.App.3d 309 [168 Cal.Rptr. 552].) We discuss them briefly, however, for the guidance of the Board in its determination of the single factual question on which we will order remand (the correct portion of prospective rate increases to be included in current income).

■ (1) Burden of proof: At an assessment appeal hearing the assessment is assumed to be fair, and the taxpayer has the burden of proving otherwise. (Ehrman & Flavin, Taxing Cal. Property (3d ed. 1989) § 27.10, p. 27-18.) James Williams, staff counsel for the Board, testified that he understood the taxpayer's burden to be proof by a preponderance of the evidence. When a new member joins the Board, the chief counsel tells him or her, as part of the standard orientation, that at hearings on reassessment petitions the burden is "weight of the evidence," i.e., more than 50 percent proof. Contrary to the Railroads' contention, that advice does describe, in lay terms, the concept of a preponderance of evidence. The other evidence presented at trial did not show the Board has systematically imposed a higher burden on the Railroads.

■ (2) Quorum of the Board: There was evidence that one Board member typically did not attend reassessment hearings, and that at the 1980 hearings "one or more members were called out at various times." The record does not support the Railroads' claim that the evidence was heard by less than a quorum of the Board. (See Cal. Code Regs., tit. 18, § 311 [quorum is majority of Board]; compare *Universal Cons. Oil Co.* v. *Byram* (1944) 25 Cal.2d 353, 359-361 [153 P.2d 746]; *Bandini Estate Co.* v. *Los Angeles* (1938) 28 Cal.App.2d 224, 230 [82 P.2d 185].)

■ (3) Dual representation and ex parte communication: Board Staff Attorney Williams testified that at reassessment hearings he represented "the

staff," i.e., he advocated the values proposed by the valuation staff, most of which had also been endorsed by the Board at its valuation hearing. Williams, however, also directly advised the Board in its decision on the reassessment petitions, preparing recommendations and proposed findings for the Board's use. These documents were not provided to the Railroads. The same attorney thus represented the Board in its role as assessor and secretly advised the Board in its role as appeals board. Such a procedure is fundamentally unfair, and should not be employed in any hearings on remand. (*Universal Cons. Oil Co.* v. *Byram, supra,* 25 Cal.2d at p. 361.)

## VI

*Did the Trial Court Err in Limiting the Scope of Remand?*

After finding the Board had used an illegal valuation method and had deprived the Railroads of due process, the trial court concluded that a remand for a de novo hearing before the Board was not necessary because "[a]ll of the facts necessary to compute the proper valuation are in the record." Instead the court remanded to the Board with directions to calculate new values using the income approach with the specific changes already discussed. The Railroads stipulated to the recalculated values as correct, and the court agreed; the court then ordered refunds in amounts earlier demanded by the Railroads, because they were smaller than those indicated by the recalculated values. ■ The Board and San Francisco contend the court was obligated to remand the case to the Board for a completely new valuation, in which the Board could exercise anew its appraisal discretion and redetermine any factual questions.

The constitutional authority to assess the Railroads' property lies with the Board, and the trial court was precluded from substituting its judgment for the Board's on questions of fact or discretionary appraisal decisions. (Cal. Const., art. XIII, § 19; *Universal Cons. Oil Co.* v. *Byram, supra,* 25 Cal.2d at p. 362; *Georgia-Pacific Corp.* v. *County of Butte, supra,* 37 Cal.App.3d at pp. 477-478.) A remand to the assessment board is generally required when the determination of refunds "is dependent upon an exercise of valuation functions and does not involve mere mathematical computations." (*Simms* v. *County of Los Angeles* (1950) 35 Cal.2d 303, 318 [217 P.2d 936].)

We have already determined that in one respect the court erred in resolving a factual question itself rather than remanding to the Board for that determination. Finding no substantial evidence supporting the Board's findings as to the pass-through of rate increases and the proper proportion of

increased expenses to revenue, the court should not have substituted its own factual judgment, but should rather have remanded to the Board for determination of the question. (*Norby Lumber Co.* v. *County of Madera* (1988) 202 Cal.App.3d 1352, 1366 [249 Cal.Rptr. 646].)

With this exception, however, the trial court correctly concluded there were no significant questions of fact or appraisal discretion left to be determined, and that a broad, de novo remand to the Board was unnecessary. In his closing argument at trial, counsel for the Board conceded that there were "no factual questions" for the court to decide, the only issues being the validity of the methods used. After the Board had recalculated values pursuant to the limited remand, and its attorney still urged there be a broad remand for de novo proceedings, the court asked whether the Board would do anything differently if it were given an unlimited remand. The Board's attorney was unable to identify anything the Board would do differently.

It is true, as San Francisco stresses in its separate briefs, that valuation of property for tax purposes is not an exact science and can involve numerous choices which are generally left to the discretion of the assessor. But here the significant appraisal decisions *had already been made*, either by the Board at the time of its initial valuation proceedings or by the court as a matter of law. It was the Board which chose the basic approach to valuation, the income approach; although the Railroads contended the stock and debt indicator should also have been considered, the court expressly declined to order the Board to employ the stock and debt approach. The next fundamental choice was between a limited and a perpetual life; that choice was made by the court as a matter of law, a determination with which we agree. It follows from the choice of a perpetual life that replacement-in-kind expenses must be deducted from income and that no capital recovery factor should be included in the capitalization rate.

If an unlimited remand were ordered, the Board, of course, might find innumerable changes of methodology and numerical data to be made. But the Board fails to show why, having *already chosen* those methods and data, it should be given an opportunity to reexamine its choices while the Railroads await the refunds due them. "Considerations of fairness and judicial economy also support not permitting the Assessor to now pursue a different valuation method." (*Prudential Ins. Co.* v. *City and County of San Francisco* (1987) 191 Cal.App.3d 1142, 1162, fn. 9 [236 Cal.Rptr. 869]; see also *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 574 [290 P.2d 544].)

## VII

*Are the Railroads Entitled to Additional Interest on the Refunds?*

 The trial court ordered interest to be paid on the refunds at the rate of 6 percent from the date the taxes were paid until January 1, 1981, and at the rate of 9 percent thereafter until the refunds are paid. The Railroads contend they are entitled to 9 percent interest from the payment of the taxes until the date of judgment and 10 percent thereafter. We conclude the proper interest rate is 6 percent from the date of the claim of refund until the date of judgment, and 7 percent thereafter.

Determination of the correct interest requires us to interpret and reconcile sections 5150 and 5151. Section 5150 provides in part: "In an action in which the recovery of taxes is allowed by the court, the plaintiff is entitled to interest on the taxes for which recovery is allowed at a rate of 6 percent per annum from the date of filing of the claim for refund, but in no event earlier than the date of payment of the tax or installments thereof sought to be refunded, to the date of entry of judgment, and such accrued interest shall be included in the judgment. This section shall also apply to any action for the recovery of taxes in which the plaintiff is a city. [¶] This section shall not apply to taxes which became due and payable before March 1, 1977. Interest on taxes which became due and payable before March 1, 1977, shall be subject to the provisions on payment of interest in effect prior to January 1, 1977. [¶] For taxes which become due and payable on and after March 1, 1981, the rate of interest allowed pursuant to this section shall be 9 percent per annum."

Section 5151 provides: "Interest at the rate of 9 percent per annum shall be paid, when that interest is ten dollars ($10) or more, on any amount refunded under Section 5096.7, or refunded as a result of the reduction of assessed value following an application for equalization by a board of equalization or by a court action to recover taxes, or as a consequence of an assessor's error, or as the result of an incorrect assessment not occasioned by the act or omission of the assessee. However, no interest shall be paid under the provisions of this section if the taxpayer has been given the notice required by Section 2635 and has failed to apply for the refund within 30 days after the mailing of that notice. [¶] Interest allowed under this section shall be computed using whichever of the following periods provides the longest period: [¶] (a) The date of the recording of the deed to the public agency acquiring the property in eminent domain to the date of the filing of the claim for refund. [¶] (b) The date of the payment of the tax on property subject to an application for equalization of the assessed value thereof to the

date of the determination of the equalized value of the property. [¶] (c) The date of the payment of the tax on property subject to a refund as a result of an assessor error in assessing the property to a date 15 days after the date of approval of the correction to the tax roll. [¶] (d) Forty-five days following the filing of a claim for refund until the refund is paid. [¶] The interest charged shall be apportioned to the appropriate funds, as determined by the county auditor." The interest rate specified in section 5151 was changed from 6 percent to 9 percent by a statute operative January 1, 1981. (Stats. 1980, ch. 411, §§ 48, 51, pp. 812-813.)

The Railroads contend that section 5151 applies because their assessments have been reduced "by a court action to recover taxes, or as a consequence of an assessor's error, or as the result of an incorrect assessment not occasioned by the act or omission of the assessee." They further contend the 9 percent rate, which was not operative until January 1, 1981, should nevertheless apply from the dates the taxes were paid, because section 5151, unlike section 5150, does not limit the 9 percent rate to taxes payable in 1981 or thereafter. The Railroads concede that section 5150 also applies, on its face, but argue that section 5151 is the more specific statute and should prevail. Finally, the Railroads claim that the proper computation period under section 5151 ended with the entry of judgment, because that constituted "the determination of the equalized value of the property" (subd. (b)), and that they are further entitled to 10 percent postjudgment interest under Code of Civil Procedure section 685.010.

The Board agrees that both sections are, on their face, applicable, but argues that section 5150 should prevail as the more specific statute because it is particularly directed at "an action in which recovery of taxes is allowed by the court," while section 5151 deals with a number of means by which a refund might be obtained, most of them nonjudicial. If section 5151 does apply, the Board further argues, it provides for accrual of 9 percent interest only after January 1, 1981. Finally, the Board argues that, under section 5151, 9 percent interest would extend "until the refund is paid" (subd. (d)) and no 10 percent postjudgment interest would be due. The trial court apparently agreed with the Board's latter line of argument, concluding that section 5151 applied but provided only 6 percent interest until January 1, 1981, and 9 percent thereafter until refund.

Sections 5150 and 5151 are in pari materia and should be construed harmoniously if reasonably possible. (2A Sutherland on Statutory Construction (4th ed. 1984) § 51.02, p. 453.) Considering the language and history of the two sections together, we conclude section 5151 does not apply when interest is included in a judgment for recovery of taxes, but rather was

intended to provide for inclusion of interest in refunds made directly by the assessing and taxing authorities. Section 5150 alone governs inclusion of interest in judgments for recovery of taxes.

First, the language of section 5151 is ambiguous, and is reasonably susceptible to the construction we give it. The interest provided for is to be paid, among other circumstances, on any amount "refunded as a result of the reduction of assessed value following an application for equalization by a board of equalization or by a court action to recover taxes . . . ." Such an accumulation of prepositions is a virtual guarantee of obscurity. The Railroads apparently read it to include taxes "refunded . . . by a court action to recover taxes." It can also be read, however, to cover amounts "refunded as a result of the reduction of assessed value . . . by a court action to recover taxes." When a court finds the assessor's methods illegal or the evidence supporting the equalization board's findings insubstantial, and remands to the board for a redetermination of value, the board on remand may reduce the assessed value. We construe the "court action" language in section 5151 to apply to this and similar circumstances, rather than to judgments ordering refunds.

The history of the two sections supports our interpretation. The language of section 5150, which expressly and unambiguously provides for the inclusion of interest in judgments for recovery of taxes, predates and provides the context for the language in section 5151.

Section 5150 is derived from two former sections, 5105 and 5141, both originally added in 1941. Both of these provided for the court judgment to include interest "at a rate per centum per annum equal to the rate per centum per annum that the defendant has received, through investment or by bank deposit, on the amount allowed and recovered . . . ." Section 5105 related to actions commenced after denial of a claim for refund, section 5141 to actions commenced to recover taxes paid under protest. The two parallel procedural routes were replaced by a single procedure, the claim for refund and subsequent suit to recover taxes, in 1976. The provisions of sections 5105 and 5141 were melded into a new section, section 5150; at the same time, the interest rate was changed from that received by the defendant to a specified rate of 6 percent. (Stats. 1976, ch. 499, § 13, p. 1243.)

Section 5151 is a renumbered version of former section 5108, which was added in 1970. (§ 5108 added by Stats. 1970, ch. 638, § 1, pp. 1255-1256, amended and renumbered as § 5151 by Stats. 1976, ch. 499, § 10, p. 1240.) When section 5108 was added, sections 5105 and 5141 were already in existence, ensuring that a taxpayer could recover interest as part of a

judgment to recover taxes. What was lacking was any provision requiring taxing authorities to pay interest when they refunded overpaid taxes without being required to do so by a court order. Section 5108 filled at least part of that gap by mandating payment of interest on refunds when property was acquired by a public agency after payment of taxes and on refunds following a reduction in assessed value. We think it unlikely that the Legislature, which must be presumed to have in mind such closely related existing laws, intended to create a conflict with sections 5105 and 5141 by specifying 6 percent as the rate to be included in judgments. Indeed, under the Railroads' interpretation, by which the "court action" language in section 5108 (now in § 5151) governs inclusion of interest in judgments, the new section would have completely superseded and obviated sections 5105 and 5141. If this were the legislative intent one would expect to find some mention of it in the statute itself, or at least in the author's explanations of the bill's purpose. In fact, however, nothing in the law or in the available legislative history for section 5108 suggests the purpose of that law was to alter the rate of interest to be included in judgments.

Our interpretation is also supported by legislative history dating from 1976, when sections 5105 and 5141 were merged into section 5150 and the rate statutorily set at 6 percent. The Senate Committee on Revenue and Taxation analyzed the pertinent portions of the bill as follows: under current law the rate of interest included in the judgment is the rate received by the taxing authority on its investments and deposits; the new law would "[s]ub-stitute[ ] . . . a provision for payment of interest at the rate of 6% per annum." (Sen. Com. on Rev. & Tax., Analysis of Assem. Bill No. 1985 (1976) p. 3.) Similarly, the Democratic Caucus wrote that the new law would "simplify[ ]" the computation of interest. (Sen. Democratic Caucus, Rev. & Tax., Analysis of Assem. Bill No. 1985 (May 11, 1976) p. 1.) This history indicates that in 1976 the legislators believed the new 6 percent provision constituted a change in the law. But under the Railroads' interpretation of section 5151, there would already have been in place, since the addition of section 5108 in 1970, a requirement that 6 percent interest be included in the judgment. Thus the evidence from 1976 strengthens our conclusion that the Legislature did not intend section 5151, which was given its new number by the same 1976 statute which created section 5150, to apply to inclusion of interest in judgments for recovery of taxes.

Even if section 5151 were construed to apply to the inclusion of interest in judgments, we would agree with the Board that, between the two laws, section 5150 addresses that point more specifically. Section 5151 concerns taxes refunded in a variety of circumstances, while section 5150 focuses more narrowly on "an action in which the recovery of taxes is allowed by the

court," and specifically mandates that the interest "shall be included in the judgment." To the extent that the two are inconsistent, the more particular law, section 5150, must control. (Code Civ. Proc., § 1859.)

Because all of the taxes at issue here were due after March 1, 1977, and before March 1, 1981, the interest to be included in the judgment is 6 percent, running from the dates the claims for refund were filed. Under Code of Civil Procedure section 685.010, the Railroads would also be entitled to postjudgment interest at the rate of 10 percent. Government Code section 970.1, however, provides that Code of Civil Procedure section 685.010 is inapplicable to money judgments against local governments; instead the constitutional rate of 7 percent applies. (Cal. Const., art. XV, § 1; *San Francisco Unified School Dist.* v. *San Francisco Classroom Teachers Assn.* (1990) 222 Cal.App.3d 146, 150-152 [272 Cal.Rptr. 38].)

## VIII

*Disposition*

The judgment is affirmed, except as to that portion of the judgment determining that the Board erred in estimating current income. The superior court is directed to order the following limited remand to the Board: (1) to recalculate values using the CPI-adjusted, five-year average; and (2) to redetermine whether rate increases granted during or after the income-reporting period should be included in income to be capitalized, and to recalculate values accordingly. The Board is to change no other methods or data. The superior court shall retain jurisdiction and, upon return of the remand, shall determine refunds due. Interest on any refunds is to be included in the judgment at the yearly rate of 6 percent from the date the claim for refund was filed, and the Railroads are further entitled to postjudgment interest at the yearly rate of 7 percent. Postjudgment interest is to be measured from April 25, 1988, the date of the judgment. The parties shall bear their own costs on appeal.

King, J., and Haning, J., concurred.

The petition of defendants and appellants for review by the Supreme Court was denied September 26, 1991.