[No. A055683. First Dist., Div. Two. Jan. 19, 1993.]

FREEPORT-McMORAN RESOURCE PARTNERS, Plaintiff and Appellant, v.
COUNTY OF LAKE, Defendant and Respondent.

**COUNSEL**

Crosby, Heafey, Roach & May, Peter W. Davis, John E. Carne and Peter L. Shaw for Plaintiff and Appellant.

Cameron L. Reeves, County Counsel, and Anita L. Grant, Deputy County Counsel, for Defendant and Respondent.

Thomas M. Fries, County Counsel (Imperial), Allen Lenefsky, Deputy County Counsel, Endman, Lincoln, Turek & Heater, Donald R. Lincoln and Henry E. Heater as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**KLINE, P. J.**—This case arises from a dispute regarding the property tax assessment of geothermal power plants owned by appellant Freeport-McMoran Resource Partners (Freeport). Appellant contends the county overvalued the property by basing its assessment on capitalization of the income stream of fixed price contracts under which appellant sells electricity to Pacific Gas and Electric Company (PG&E) at rates well above present market rates.

### STATEMENT OF THE CASE AND FACTS

Under the Public Utility Regulatory Policies Act of 1978 (PURPA), 16 United States Code section 796 et seq., and Federal Energy Regulatory Commission (FERC) rules, utilities are required to purchase electricity from

"qualifying facilities" (facilities that meet FERC requirements) at a price no greater than the utility's "avoided cost" (the cost the utility would have incurred by generating the electricity itself). (16 U.S.C. § 824a-3 (1985); 18 C.F.R. § 292.101(b)(6)(1990).) As a result of PURPA, the California Public Utilities Commission (CPUC) approved "standard offer" contracts to encourage qualifying facilities to sell energy to public utilities on standardized terms. The energy prices in these contracts were developed by public utilities and approved by the CPUC in 1983 based on then current forecasts of future market prices for fuel. Four types of standard offer contracts were developed, of which two are relevant here. Standard Offer 1 agreements (SO1) provided for payments to be adjusted throughout the contract term to reflect changes in the utility's short-run avoided costs; Standard Offer 4 agreements (SO4) were long-term energy supply contracts that contained various payment options including a fixed price option.

As of the lien date, March 1, 1989, appellant owned and operated two geothermal power plants in Lake County that were qualifying facilities under PURPA (West Ford Flat and Bear Canyon Creek). Appellant had previously acquired from third parties SO4 contracts with 20-year terms and the plants began supplying energy to PG&E under the terms of these contracts in 1989.[1] The contracts provided for a fixed price for the first 10 years based upon 1983 projections of PG&E's avoided costs over the contract term, the principal component of these long-run avoided costs being the market price of natural gas purchased by PG&E to generate electricity. Payment during the subsequent 10 years was to be based on PG&E's short-run avoided operating costs, which are adjusted from time to time to reflect changes in the market price of natural gas.

In 1985, the CPUC suspended approval of new SO4 agreements with fixed energy prices, after determining that the fixed prices did not reflect market prices for energy because they were based on overestimates of the utilities' long-run avoided operating costs due to incorrect assumptions that market prices for natural gas would continue to rise. As of March 1, 1989, the only new standard offer contracts available to geothermal plants from PG&E were the adjustable SO1 agreements. Existing SO4 contracts remained in force.

The county's witnesses testified before the Lake County Board of Supervisors, acting as the Board of Equalization (Board) that the terms of the SO4 contracts could not be changed during the contract term; that the contracts

---

[1]Appellant originally acquired SO4 contracts for supply of energy from as yet unbuilt facilities in Sonoma and Lake counties; PG&E consented to transfer of the contracts to appellant's properties.

were assignable; that appellant's properties would be offered for sale only in conjunction with the SO4 contracts that provided the terms for sale of electricity and so were necessary to make the projects economically viable; that a project with an SO4 agreement would sell at a higher price than one with an SO1 agreement because the former guarantees a higher income; and that an SO4 contract in and of itself (not attached to a project) would not have value in the marketplace. Appellant's witness testified that geothermal plants and SO4 contracts are distinct assets that can be sold separately and have separate values, but acknowledged that as a general rule purchasers of the projects simultaneously purchase the contracts.

In determining the assessed value of appellant's plants, the assessor calculated the income stream for the years 1989-1998 by reference to the fixed energy prices in the SO4 agreements. The West Ford Flat plant was valued at $166,163,000, and the Bear Canyon Creek plant was valued at $100,630,000. Appellant applied for changed assessment, contending the assessor should have based his valuation on the market prices for energy in effect in 1989, which were much lower than the prices in the SO4 contracts. According to appellant, the two plants should have been valued at $55,412,000 and $22,908,700 respectively. The Board held a hearing on appellant's applications on November 29 and 30, 1989, and issued findings of fact on May 22, 1990, upholding the assessor's method of forecasting income. The Board determined that the taxable values of the plants were $157,108,287 and $93,801,278 respectively.

On November 13, 1990, appellant filed a complaint in superior court for refund of taxes and declaratory relief. The parties stipulated to the relevant facts and submitted the matter on cross-motions for summary judgment. The parties agreed that the capitalized income approach was the proper one to use in determining the value of geothermal properties but disagreed as to the proper method for determining the income stream to be utilized under this approach. The parties further agreed that if appellant's method of determining the income stream was accepted the correct values of the two properties would be $55,412,000 and $22,908,700, while if the Board's method was accepted the correct values would be $157,108,287 and $93,801,278.

On August 28, 1991, the court granted the county's motion for summary judgment, ruling that the income approach was the appropriate method by which to determine the fair market value of the properties, that the assessor's and Board's valuation method was valid and that substantial evidence supported the Board's determination concerning the proper application of the income approach to valuation.

A timely notice of appeal was filed on November 15, 1991.

DISCUSSION

I.

 The parties dispute whether this court should employ a de novo or a substantial evidence standard of review in this case. Where a taxpayer challenges the validity of the valuation method used by an assessor, the trial court must determine as a matter of law "whether the challenged method of valuation is arbitrary, in excess of discretion, or in violation of the standards prescribed by law." (*Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14, 23 [127 Cal.Rptr. 154, 544 P.2d 1354].) Our review of such a question is de novo. (*Dennis* v. *County of Santa Clara* (1989) 215 Cal.App.3d 1019, 1025-1026 [263 Cal.Rptr. 887].) By contrast, where the taxpayer challenges the application of a valid valuation method, the trial court must review the record presented to the Board to determine whether the Board's findings are supported by substantial evidence but may not independently weigh the evidence. (*Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* 16 Cal.3d at p. 23; *Dennis* v. *County of Santa Clara, supra,* 215 Cal.App.3d at p. 1026.) This court, too, reviews a challenge to application of a valuation method under the substantial evidence rule. (*Dennis* v. *County of Santa Clara, supra,* 215 Cal.App.3d at p. 1026.)

 In the present case, the assessor employed the income approach to valuation, which "estimates current fair market value of a property by attempting to determine the amount that an investor would be willing to pay for the right to receive the future income the property is projected to produce." (*Union Pacific Railroad Co.* v. *State Bd. of Equalization* (1991) 231 Cal.App.3d 983, 989-990 [282 Cal.Rptr. 745].) The parties stipulated that they "agree that the 'income approach to value,' referred to in Rule 8, [California Code of Regulations, title 18, section] 8, is the proper approach for assessing properties of this kind" and that the only dispute in the case is "about the proper method for determining the income stream for these properties under an income approach to valuation." Appellant views this as a case for de novo review, characterizing the issue as whether the valuation method used by the county and Board was proper; the county views the disputed issue of which income stream to utilize as a question of "application" of the income method of valuation.

The determination whether a challenge is to "method" or "application" is not always easy. In *Union Pacific Railroad Co.* v. *State Bd. of Equalization, supra,* 231 Cal.App.3d 983, 989, railroad operating assets had been assessed by means of the " 'income' or 'capitalized earnings ability' approach." The parties agreed this was the best general approach for valuing the assets in

question but disputed issues regarding the size of the income stream—whether certain costs should be deducted as expenses and whether the income stream should be projected as a perpetuity or a limited lifetime. (*Id.*, at pp. 989-990.) With respect to the standard of review, the court stated: "A valuation method may be recognized as theoretically coherent and logical, yet be so inappropriate to the type of property being assessed as to ensure, for all properties of that general kind, that the results reached will not approximate fair market value. A claim of this kind could be termed a challenge to the 'application' of the method, presenting a factual question. But where the claim is that, due to the basic undisputed characteristics shared by an entire class of properties, the challenged method will produce systematic errors if applied to properties in that class, the issue is not factual but legal. The issue is not whether the assessor misunderstood or distorted the available data, but whether he or she chose an appraisal method which by its nature was incapable of correctly estimating market value." (231 Cal.App.3d at p. 992; see *Southern Pacific Transportation Co.* v. *State Bd. of Equalization* (1987) 191 Cal.App.3d 938, 956 [237 Cal.Rptr. 191].)

Similarly, here, the parties dispute which of two possible methods of determining the income stream to be used in an assessment under the income approach to valuation is the more appropriate given the nature of the properties and industry in question. There are no disputed issues of fact; the parties agree even on the amount of the valuation under either approach. The question presented is one of law and we review the court's decision de novo.

## II.

Revenue and Taxation Code section 401[2] requires that all property subject to general property taxation be assessed at its "full value." " '[F]ull cash value' " or " 'fair market value' " is defined as "the amount of cash or its equivalent which property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes." (§ 110, subd. (a); see *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 563 [290 P.2d 544]; Cal. Code Regs., tit. 18, § 2.) Fair market value " 'is a measure of desirability translated into money amounts [citation], and might be called the market value of property for use *in its present condition.*' " (*Union Pacific R.R. Co.* v. *State Bd. of Equalization* (1989) 49 Cal.3d 138, 148 [260 Cal.Rptr. 565, 776 P.2d 267], quoting *De*

---

[2]All statutory references will be to the Revenue and Taxation Code unless otherwise specified.

*Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d at p. 562, italics added in *Union Pacific.*)

■ The income method is one of three basic methods for determining full cash value, the others being the comparative sales approach and the reproduction and replacement cost approach. (Cal. Code Regs., tit. 18, § 3; *Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* 16 Cal.3d 14, 24.) "The income method rests upon the assumption that in an open market a willing buyer of the property would pay a willing seller an amount approximately equal to the present value of the future income to be derived from the property." (*Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* 16 Cal.3d at p. 24.) "Under this approach, an appraiser values an income-producing property by estimating the present worth of a future income stream. 'The income approach may be called the capitalization method because capitalizing is the process of converting an income stream into a capital sum, i.e., value.' [Citations.] The assessor capitalizes 'the sum of anticipated future installments of net income from the property, less an allowance for interest and the risk of partial or no receipt.' [Citation.]" (*Union Pacific R.R. Co.* v. *State Bd. of Equalization, supra,* 49 Cal.3d at p. 148; see Cal. Code Regs., tit. 18, § 3, subd. (e) [defining income approach as "[t]he amount that investors would be willing to pay for the right to receive the income that the property would be expected to yield, with the risks attendant upon its receipt"].) Since a property's "full value" must be determined by reference to the price it would bring on an open market, "[t]he net earnings to be capitalized . . . are not those of the present owner of the property, but those that would be anticipated by a prospective purchaser." (*De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d at p. 566.)

■ Appellant contends that assessment of the value of its properties based upon the income to be generated under the SO4 contracts violated the requirement that an objective, market based standard be used to determine the income to be capitalized. According to appellant, because SO4 contracts were no longer available as of the lien date, the value of the properties must be determined by reference to the market price for electricity reflected in an SO1 contract.

Appellant relies upon cases holding that the value of properties subject to below-market rate leases must be determined by reference to the income the properties could generate on the open market rather than the income generated under the actual contracts. (*Clayton* v. *County of Los Angeles* (1972) 26 Cal.App.3d 390 [102 Cal.Rptr. 687]; *Dennis* v. *County of Santa Clara, supra,* 215 Cal.App.3d 1019.) These cases rest upon the premise that property owners cannot deflate the value of their properties for tax purposes by

entering "bad" leases. (*Clayton* v. *County of Los Angeles, supra,* 26 Cal.App.3d at pp. 392-393; *Dennis* v. *County of Santa Clara, supra,* 215 Cal.App.3d at pp. 1029-1031; see *Carlson* v. *Assessment Appeals Bd. I* (1985) 167 Cal.App.3d 1004 [213 Cal.Rptr. 555] [improper to consider privately imposed restrictions on use of property in determining value].) As explained in *De Luz Homes, Inc.* v. *County of San Diego, supra:* "The present owner may have invested well or poorly, may have contracted to pay very high or very low rent, and may have built expensive improvements or none at all. To value property by capitalizing his anticipated net earnings would make the value of property equal to the present value of his profits; since, however, the legislative standard of value is 'full cash value,' it is clear that whatever may be the rationale of the property tax, it is not the profitableness of property to its present owner." (45 Cal.2d at p. 566.)

The cases do not, however, require that valuation be based on market rather than actual income forecasts in all circumstances. In *De Luz Homes, Inc.,* the court determined that the value of a housing project located on a military installation should be determined by capitalizing expected future actual income, noting that future income could be expected to remain stable because rents were controlled by the government and occupancy was assured by the fact that the project was located on a permanent military installation. (45 Cal.2d at pp. 571-572.)[3] *Host International, Inc.* v. *County of San Mateo* (1973) 35 Cal.App.3d 286 [110 Cal.Rptr. 652], involved valuation of the possessory interest under a lease of space for food concessions at San Francisco International Airport. The lease required Host to pay the higher of a monthly minimum or a percentage of gross sales; Host argued that valuation based on its actual rental payments was improper because these payments exceeded the income that could have been obtained if the lease-hold was sold on the open market. The court held it proper to use Host's experience as a guide to market value, as there were no sales of comparable leases and no evidence other operators would not assume the existing lease. (35 Cal.App.3d at p. 289.)

In the present case, appellant owns a geothermal plant and a contract guaranteeing for 10 years an income that exceeds the income obtainable absent the contract. Appellant's argument that its future income must be determined based on current market prices because SO4 contracts are no

---

[3]*De Luz Homes, Inc.* did not involve a question of market versus above- or below-market rents; the alternative means of determining future income considered by the court was to impute an amount of income equal to a minimum reasonable return on estimated market value. (45 Cal.2d at p. 565.) The court indicated that the imputed income method should be used where future income could not be estimated with reasonable accuracy or could not be ascribed entirely to the property, as when actual income is derived largely from enterprise activity. (*Id.,* at pp. 565, 572.)

longer available ignores the obvious fact that appellant's income for the 10-year period in question is fixed by the SO4 contract at a level above the current market price. The evidence in this case showed that appellant's plant would only be offered for sale in conjunction with the SO4 contract because the contract is integral to the economic viability of the plant and that a prospective purchaser would be willing to pay more for a plant with an SO4 contract than for a plant without one because the SO4 contract guarantees a higher income. As stated in *Host International, Inc.,* "*De Luz* permits reference to appellant's operation in determining what another lessee would pay for the same space upon like terms. It recognizes also, as a factor in market value of the possessory interest, governmental control of the project and stability of income . . . ." (35 Cal.App.3d at p. 290.) Since the "full value" of appellant's property must be taxed (§ 401), and "full cash value" must be determined, under the income approach, by capitalizing the net earnings "that would be anticipated by a prospective purchaser" (*De Luz Homes, Inc., supra,* 45 Cal.2d at p. 566), to ignore the SO4 contracts would be to artificially deflate the value of appellant's properties.

Appellant's reliance on the board of equalization's property tax rule 8, subdivision (d), is unavailing. Rule 8, subdivision (d), provides: "In valuing property encumbered by a lease, the net income to be capitalized is the amount the property would yield were it not so encumbered, whether this amount exceeds or falls short of the contract rent and whether the lessor or the lessee has agreed to pay the property tax." (Cal. Code Regs., tit. 18, § 8, subd. (d).) Appellant extrapolates from this a rule that property must be valued without consideration of any type of contract pertaining to income to be derived from property. We are unwilling to accept appellant's broad interpretation. Rule 8, subdivision (d), is by its terms addressed specifically to leases; it serves the purpose of precluding potential manipulation by property owners of the taxable value of their property. (See *Clayton* v. *County of Los Angeles, supra,* 26 Cal.App.3d 390; *Dennis* v. *County of Santa Clara, supra,* 215 Cal.App.3d 1019.) The present case presents no possibility of such manipulation, since the income to be generated by the property is fixed by contract terms that cannot be altered. Unlike leases (*Clayton* v. *County of Los Angeles, supra,* 26 Cal.App.3d 390; *Dennis* v. *County of Santa Clara, supra,* 215 Cal.App.3d 1019) or deed restrictions (*Carlson* v. *Assessment Appeals Bd. I, supra,* 167 Cal.App.3d 1004), the contracts that determine the income to be produced by appellant's properties are regulated by the state and cannot be modified by the parties without governmental approval. In light of this regulation, capitalization of the income to be generated under the contract properly measures the value of appellant's property because it is the income a prospective purchaser of the property not

only could anticipate but would be guaranteed. It would appear obvious that if the situation were reversed and the S04 contracts prescribed a below-market rate of income, appellant would be advancing precisely the position taken by the county here—and, in that situation, would be entitled to the benefit of the decrease in property value.

Indeed, appellant's characterization of the "market" to which reference must be made in determining the value of its properties is misguided. While appellant stresses that only SO1 contracts are currently available from PG&E, this simply means that a purchaser negotiating with PG&E for a new power purchase agreement would only be able to obtain an SO1 contract. The evidence showed that a purchaser could obtain an SO4 contract in a transaction for an existing power project with an SO4 contract, and that no SO1 contract projects were in operation in PG&E territory. Since some 60 to 70 percent of the 1,300 to 1,500 qualifying facilities in California operate with SO4 contracts, the assessor determined that the market for SO4 projects constituted a market for prospective purchasers. The evidence thus shows that the proper market against which to judge the value of appellant's plants was that consisting of existing facilities with SO4 contracts.

We are not persuaded by appellant's argument that consideration of the SO4 contract income impermissibly taxes nontaxable intangible property. ▉ Only tangible personal property is subject to taxation. (Cal. Const., art. XIII, § 2; *ITT World Communications, Inc.* v. *County of Santa Clara* (1980) 101 Cal.App.3d 246, 251 [162 Cal.Rptr. 186].) But " '[i]ntangible values . . . that cannot be separately taxed as property *may be reflected in the valuation of taxable property.* Thus, in determining the value of [taxable] property, assessing authorities may take into consideration earnings derived therefrom, which may depend upon the possession of intangible rights and privileges that are not themselves regarded as a separate class of taxable property.' " (*County of Stanislaus* v. *Assessment Appeals Bd.* (1989) 213 Cal.App.3d 1445, 1455 [262 Cal.Rptr. 439], quoting *Roehm* v. *County of Orange* (1948) 32 Cal.2d 280, 285 [196 P.2d 550], italics added in *County of Stanislaus.*) " '[M]arket value for assessment purposes is the value of property when *put to beneficial or productive use.*' " (*County of Stanislaus* v. *Assessment Appeals Bd., supra,* 213 Cal.App.3d at p. 1455, italics in original.) For example, *County of Stanislaus, supra,* involved taxation of a cable television franchise. The franchise was viewed as consisting of two components, the right to use public streets for cables and the right to charge fees to subscribers for use of the cable facilities. The former component, the possessory interest, was taxable while the latter component, the right to do business, was not. Nevertheless, the court concluded that the value of the intangible right—without which the possessory interest could not be put to

beneficial or productive use—should be considered in valuing the possessory interest. (213 Cal.App.3d at pp. 1451-1456.) ■ In this case the SO4 contracts are the means by which appellant's properties are put to beneficial use and must be considered in assessing the properties' "full value."

We are similarly unpersuaded by appellant's argument that valuation on the basis of the SO4 contract improperly taxes appellant's enterprise activity or business skill. ■ Under the income approach to valuation, only "earnings from the property itself or the beneficial use thereof" are to be considered; income derived in large part from enterprise activity may not be ascribed to the property. (*California Portland Cement Co.* v. *State Bd. of Equalization* (1967) 67 Cal.2d 578, 584 [63 Cal.Rptr. 5, 432 P.2d 700]; *United Air Lines, Inc.* v. *County of San Diego* (1991) 1 Cal.App.4th 418, 438 [2 Cal.Rptr.2d 212].) "When no sound or practicable basis appears for apportionment of income as between enterprise activity and the property itself, then a method may be employed which imputes an appropriate income to the property." (*California Portland Cement Co.* v. *State Bd. of Equalization, supra,* 67 Cal.2d at p. 584; *United Air Lines, Inc.* v. *County of San Diego, supra,* 1 Cal.App.4th at p. 438.) In *California Portland Cement Co.,* the owner of a quarry and adjacent cement factory contended that profitability of its manufacturing business could not be considered in valuing the property. The court rejected the owner's argument that its business profits were not relevant to determining the "full cash value" of the cement mill as "a play on words which lacks persuasion," noting that the quarry and cement mill were "operated as a unit, with each contributing to the economy and profitability of the other." (67 Cal.2d at p. 585) ■ In the present case, because the SO4 contract is the means by which appellant can sell the electricity it produces, the income generated by the SO4 contract is inextricably tied to the beneficial use of the property and properly considered in assessing its value.

Moreover, there is no evidence the increased value of the SO4 contract over an SO1 contract's market rate is due to appellant's enterprise activity: The higher price received under the SO4 contract is not the result of appellant's successful operation of its plants but of the regulatory scheme that allowed appellant the benefit of a long-term fixed contract price.

The judgment is affirmed.

Smith, J., and Benson, J., concurred.

A petition for a rehearing was denied February 18, 1993, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied April 15, 1993.