[No. B147752. Second Dist., Div. Four. June 5, 2002.]

WATSON COGENERATION COMPANY, Plaintiff and Appellant, v. COUNTY OF LOS ANGELES, Defendant and Respondent.

**COUNSEL**

Morrison & Foerster, Thomas H. Steele, Peter B. Kanter and Pilar M. Sansone for Plaintiff and Appellant.

Rodi, Pollock, Pettker, Galbraith & Cahill, C. Stephen Davis and Cris K. O'Neall for Independent Energy Producers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Lloyd W. Pellman, County Counsel, and Albert Ramseyer, Principal Deputy County Counsel, for Defendant and Respondent.

## OPINION

**EPSTEIN, Acting P. J.**—In this case, we conclude it was proper for the Los Angeles County Assessor to consider the actual income stream resulting from an above-market price government-facilitated power purchase agreement in the property tax valuation of an independent power plant developed and operating under that agreement. For this reason, we affirm the judgment in favor of the County of Los Angeles (County).

### FACTUAL AND PROCEDURAL SUMMARY

Appellant is Watson Cogeneration Company, an independent power producer which owns and operates a cogeneration power facility located within Atlantic Richfield Company's Los Angeles Refinery in Carson. The facility was developed as a "qualifying facility" in accordance with the Public Utility Regulatory Policies Act of 1978 (16 U.S.C. § 796 et seq.), a federal legislative scheme intended to encourage the development of cogeneration and small power production facilities. The rules promulgated by the Federal Energy Regulatory Commission as part of this program required utilities to purchase electric energy from a qualifying facility at the utility's avoided cost. This is the cost the utility would have incurred had it generated the electricity itself—the construction cost plus the operating costs.

To assist in the implementation of this federal legislation, the California Public Utilities Commission (PUC) approved a series of "standard offer contracts" which contained standardized terms for the utilities' purchase of power from qualifying facilities. The standard offer contracts were intended to overcome the disparities in bargaining power between the utilities and the qualifying facilities by approving standardized terms for the sales. A qualifying facility which met the terms of a standard offer contract would be assured of selling its output to a public utility, and the utility would be assured that the PUC would approve passing along the cost of the purchased energy to its ratepayers.

Most of the standard offer contracts were long term. The energy prices in these contracts were based on forecasts of future market prices for fuel. Because some assumptions underlying the avoided cost structure were not borne out by subsequent events, the pricing of certain standard offer contracts exceeded the market price eventually established for electricity.

In 1984, before appellant Watson built its qualifying facility, it entered into a modified version of a standard offer 2 contract with Southern California Edison. This was a long-term contract, running from April 1988 to April 2008, providing for fixed capacity payment, capacity bonus payments, and avoided-cost energy pricing. It is undisputed that as of the lien date for tax year 1997, this power purchase agreement provided Watson with above-market prices for its output.

Watson's cogeneration facility was assessed by the Los Angeles County Tax Assessor for tax year 1997. Watson paid the tax, then filed an application with the Los Angeles County Assessment Appeals Board (Board) for refund of $2,491,343.30, claiming the tax assessment should not have included the full value of its power purchase agreement because that favorable contract is an intangible asset exempt from property taxation. The Board denied Watson's application, and the Los Angeles County Board of Supervisors denied Watson's subsequent claim for refund.

Watson then brought this action against the County for tax refund. The parties filed cross-motions for summary judgment. After oral argument and additional briefing, the trial court granted the County's motion for summary judgment. Watson appeals from the judgment.

## DISCUSSION

Watson argues that its contract is an intangible asset exempt from property tax, and claims the County improperly included it as taxable property in its assessment. Under the California Constitution, "All property is taxable and shall be assessed at the same percentage of fair market value." (Cal. Const., art. XIII, § 1.) For purposes of property taxation, fair market value is "the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes." (Rev. & Tax. Code, former § 110, subd. (a).)[1]

Article XIII, section 2 of the Constitution gives the Legislature authority to exempt certain property from taxation. Accordingly, section 212, subdivision (c) provides that "the value of intangible assets and rights shall not enhance or be reflected in the value of taxable property." But subdivision (c)

---

[1]All statutory references are to the Revenue and Taxation Code unless otherwise indicated.

also provides that "[T]axable property may be assessed and valued by assuming the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use." (See also § 110, subds. (d) & (e).)

 In accordance with this exemption, California decisions have held that assets such as copyrights, liquor licenses, airport car rental concessions, ballpark food concessions, and cable television franchises are intangible rights which cannot be directly subjected to property tax assessment. (See, e.g., *Michael Todd Co. v. County of Los Angeles* (1962) 57 Cal.2d 684, 693 [21 Cal.Rptr. 604, 371 P.2d 340]; *Roehm v. County of Orange* (1948) 32 Cal.2d 280, 290 [196 P.2d 550]; *Shubat v. Sutter County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 794, 803-805 [17 Cal.Rptr.2d 1]; *County of Los Angeles v. County of Los Angeles Assessment Appeals Bd.* (1993) 13 Cal.App.4th 102, 112-113 [16 Cal.Rptr.2d 479]; *County of Stanislaus v. Assessment Appeals Bd.* (1989) 213 Cal.App.3d 1445, 1453-1454 [262 Cal.Rptr. 439].) But while "intangible property is exempted from direct property taxation, the courts in this state have repeatedly held that the value of such intangible property may be included in the valuation of otherwise taxable tangible property." (*GTE Sprint Communications Corp. v. County of Alameda* (1994) 26 Cal.App.4th 992, 1002 [32 Cal.Rptr.2d 882]; *Shubat v. Sutter County Assessment Appeals Bd., supra,* 13 Cal.App.4th at p. 804; *County of Stanislaus v. Assessment Appeals Bd., supra,* 213 Cal.App.3d at pp. 1454-1455; see also *County of Orange v. Orange County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 524, 534 [16 Cal.Rptr.2d 695].) That is what was done in this case.

 The California State Board of Equalization Assessors' Handbook[2] explains the interaction of these two concepts: "Even though intangible assets and rights are not subject to taxation, the second fundamental principle states that tangible property should nonetheless be assessed and valued by assuming the presence of those intangible assets and rights that are necessary to put the tangible property to beneficial or productive use. Under this principle, an appraiser valuing tangible property must assume the presence of any intangible assets or rights necessary to the beneficial or productive use of the property being valued. The 'beneficial or productive use' is equivalent to the highest and best use of the property." (State Bd. of Equalization, Assessors' Handbook—Treatment of Intangible Assets and

---

[2]Assessors' handbooks have been relied upon by the courts and been accorded great weight in the interpretation of valuation questions. (*CAT Partnership v. County of Santa Cruz* (1998) 63 Cal.App.4th 1071, 1085, fn. 12 [74 Cal.Rptr.2d 652]; *Prudential Ins. Co. v. City and County of San Francisco* (1987) 191 Cal.App.3d 1142, 1155 [236 Cal.Rptr. 869].)

Rights (1998) p. 150; see also *Pacific Mutual Life Ins. Co. v. County of Orange* (1985) 187 Cal.App.3d 1141, 1148 [232 Cal.Rptr. 233] [The "highest and best use of property" is a factor in determining market value.]; *CAT Partnership v. County of Santa Cruz, supra,* 63 Cal.App.4th 1071, 1085 [land should "be valued at its highest and best use subject to the condition that the use be one which is *legally permissible*"].)

The choice of valuation method resides in the assessor, subject to review by the Board and the courts. (*Kaiser Center, Inc. v. County of Alameda* (1987) 189 Cal.App.3d 978, 984, fn. 4 [234 Cal.Rptr. 603].) ██ In this case, the assessor used the income approach for determining fair market value.[3] The income approach is defined as "[t]he amount that investors would be willing to pay for the right to receive the income that the property would be expected to yield, with the risks attendant upon its receipt." (Cal. Code Regs., tit. 18, § 3, subd. (e).) "Using the income approach, an appraiser values an income property by computing the present worth of a future income stream. This present worth depends upon the size, shape, and duration of the estimated stream and upon the capitalization rate at which future income is discounted to its present worth." (Cal. Code Regs., tit. 18, § 8, subd. (b).) The net earnings to be capitalized are not those of the current owner, but those that a prospective purchaser would anticipate. (*De Luz Homes, Inc. v. County of San Diego* (1955) 45 Cal.2d 546, 566 [290 P.2d 544].)

 Watson does not claim that it was improper to use the income approach. It argues the income approach was improperly applied, because the assessor did not remove the value of the power purchase agreement, an intangible asset, from the assessment. According to Watson: "The issue in this case is whether the Assessor can tax Watson's property based not upon the fair market value of that property, but upon income Watson receives by operating its power plant pursuant to an above-market contract with Edison and the ARCO Refinery."[4]

The problem with this position is that undisputed evidence established that the highest and best use of the property as of the lien date was as a

---

[3]There are three general methods of valuation for property assessment. The market approach looks at recent sales of comparable property, including that being valued; the income or discounted cash flow approach looks at the present value of a projected stream of income from use of the property; the cost approach looks at the cost of replacing the property, less accrued depreciation. (*Shubat v. Sutter County Assessment Appeals Bd., supra,* 13 Cal.App.4th 794, 797.)

[4]We treat this challenge to the validity of the valuation method as an issue of law. (See *GTE Sprint Communications Corp. v. County of Alameda, supra,* 26 Cal.App.4th 992, 1001.)

qualifying facility, selling its power to Southern California Edison pursuant to the power purchase agreement. That agreement assured Watson a guaranteed purchaser for its entire output, and provided for sale of that power at an above-market price. Where, as here, the income flow can be expected to remain stable, based on controlled pricing and assured usage, the value of the property "can best be estimated in terms of actual income rather than imputed income." (*De Luz Homes, Inc. v. County of San Diego, supra,* 45 Cal.2d 546, 572.)

This is the conclusion reached in *Freeport-McMoran Resource Partners v. County of Lake* (1993) 12 Cal.App.4th 634 [16 Cal.Rptr.2d 428], a case based on strikingly similar facts. The appellant in *Freeport-McMoran* was the owner of geothermal power plants, which were qualifying facilities operating under standard offer 4 (SO4) contracts. These were 20-year contracts, providing a fixed price for the first 10 years based upon Pacific Gas and Electric Company's (PG&E) projected avoided costs, and an adjustable price for the second 10 years, based on PG&E's short-run avoided costs. The prices under the SO4 contracts, like the prices under Watson's power purchase agreement, were above the market price. The owner claimed, as Watson does, that the county overvalued the property by basing its assessment on the income stream of the standard offer contracts rather than on market rates.

Relying on *De Luz Homes, Inc. v. County of San Diego, supra,* 45 Cal.2d 546, the court held that valuation need not be based on market rather than actual income forecasts in all instances. (*Freeport-McMoran Resource Partners v. County of Lake, supra,* 12 Cal.App.4th at p. 643.) The court in *De Luz Homes, Inc.* held that the value of a housing project located on a military installation should be determined by capitalizing the expected future *actual* income, noting that future income could be expected to remain stable because rents were controlled by the government and occupancy was assured since the project was located on a permanent military installation. (*De Luz Homes, Inc. v. County of San Diego, supra,* 45 Cal.2d at pp. 571-572.)

The evidence in *Freeport-McMoran* showed that the owner's plant would only be offered for sale in conjunction with the standard offer contract because "the contract is integral to the economic viability of the plant" and that a prospective purchaser would be willing to pay more for a plant with such contract than without because the contract guarantees a higher income. The court felt that ignoring these facts would artificially deflate the value of the property, in violation of the assessor's obligation to determine the full cash value of the property. (*Freeport-McMoran Resource Partners v. County*

*of Lake, supra,* 12 Cal.App.4th at p. 644.) Instead the court defined the relevant market as those power facilities with SO4 contracts. (*Id.* at p. 645.)

The court rejected the owner's argument that consideration of the SO4 contract income impermissibly taxed nontaxable intangible property, reciting the well-established rule that " ' "[i]ntangible values . . . that cannot be separately taxed as property may be reflected in the valuation of taxable property. Thus, in determining the value of [taxable] property, assessing authorities may take into consideration earnings derived therefrom, which may depend upon the possession of intangible rights and privileges that are not themselves regarded as a separate class of taxable property." ' [Citations.] . . . In this case the SO4 contracts are the means by which appellant's properties are put to beneficial use and must be considered in assessing the properties' .'full value.' " (*Freeport-McMoran Resource Partners v. County of Lake, supra,* 12 Cal.App.4th at pp. 645-646, italics omitted.)

Appellant argues that even if *Freeport-McMoran* was correctly decided based on conditions in the power generation industry at that time, it is no longer applicable in light of the subsequent deregulation of the industry. On the March 1, 1989 lien date in *Freeport-McMoran,* an independent power plant could only sell electricity to public utilities pursuant to a standard offer contract approved by the PUC. That was the basis of the court's conclusion that the SO4 contract was the means by which the owner could sell the electricity it produces, and therefore "the income generated by the SO4 contract is inextricably tied to the beneficial use of the property and properly considered in assessing its value." (*Freeport-McMoran Resource Partners v. County of Lake, supra,* 12 Cal.App.4th at p. 646.)

Watson claims this was no longer the case on the January 1997 lien date in our case. In 1996, federal deregulation opened up a federal wholesale market for electricity. After that, it was no longer necessary for an independent power plant to be a qualifying facility with a standard offer contract in order to sell its electricity; instead it could sell its power on the federal wholesale market.

During that same time period, California also was in the process of completing deregulation of the state power industry. The California Legislature approved Assembly Bill No. 1890 (1995-1996 Reg. Sess.) (Pub. Util. Code, § 330 et seq.) in September 1996. Among its provisions was authority for electricity consumers to purchase services from entities other than their local utility, and for nonutility electricity generators to provide this service. The statute also mandated creation of the California Power Exchange (Power

Exchange) to organize the wholesale market for electricity generation by selecting the lowest priced set of generators capable of meeting the state's load demand at any hour. The Power Exchange began operation on March 31, 1998.

Watson argues that these changes in the industry meant that as of the lien date, it no longer needed its power purchase agreement in order to operate its plant profitably. And since it theoretically could have operated profitably without the agreement, Watson claims it was improper for the assessor to utilize the above-market pricing in the agreement for determination of Watson's future income stream.

We disagree. As of the lien date, only the federal wholesale market was available to Watson. The Power Exchange did not begin operation for more than a year after that date. Watson's witness, Thomas Beach, testified that Watson could have operated profitably on the lien date without its power purchase agreement, but he acknowledged that it could not have operated as profitably without the power purchase agreement as with it. While Watson could have operated as a merchant plant selling its power on the federal wholesale market, the evidence was that the highest and best use of the property was as a qualifying facility with a power purchase agreement.

Watson also seeks to distinguish *Freeport-McMoran* because after deregulation, it could have sold its power purchase agreement and its power plant as separate assets. The court in *Freeport-McMoran* placed some reliance on evidence that the plant would only be offered for sale in conjunction with the SO4 contract because the contract was integral to the economic viability of the plant. (*Freeport-McMoran Resource Partners v. County of Lake, supra*, 12 Cal.App.4th at p. 644.) But it did so to reach the conclusion that a prospective purchaser would be willing to pay more for a plant with an SO4 contract than for a plant without one because the SO4 contract guaranteed a higher income. (*Ibid.*) That conclusion holds true in our case as well. The possibility that as of the lien date, Watson could have sold off its power purchase agreement does not change the fact that a buyer would have paid more for the plant with the agreement than without it. If in the future Watson sells the agreement separately, or if it enters into a buy-down agreement with Southern California Edison, its plant can then be assessed without the future income stream assured by the power purchase agreement.

We find the reasoning of *Freeport-McMoran* still applicable, and therefore find no error in the County's consideration of the power purchase agreement in its determination of the income stream of the property.

Watson complains that in following *Freeport-McMoran*, the trial court ignored California decisions holding the assessor is required to segregate and exclude intangible rights and assets from assessment. (See, e.g., *GTE Sprint Communications Corp. v. County of Alameda, supra*, 26 Cal.App.4th 992; 1005; *Service America Corp. v. County of San Diego* (1993) 15 Cal.App.4th 1232, 1239-1240 [19 Cal.Rptr.2d 165].) The intangibles in those cases included such assets as franchise rights, concession rights, cable licenses, liquor licenses, and other assets attributable to the enterprise value of the business.

The power generation facilities in *Freeport-McMoran* and in our case are different from the businesses assessed in the cited cases; and the power purchase agreements are different from the intangibles in those cases. The power generation projects in *Freeport-McMoran* and the present case were the result of government incentives and regulations specifically intended to encourage their development. Among these government-facilitated arrangements were the power purchase agreements, which assured a long-term stable income stream and facilitated financing for the development of the projects. The very existence of the projects was based on these arrangements. The power purchase agreement is inextricably intertwined with the creation and operation of the project as a qualified facility. So long as the project continues to operate as a qualified facility, receiving the predictable income stream agreed upon in the power purchase agreement, it is appropriate for the assessor to value the property based on its actual income. (See *De Luz Homes, Inc. v. County of San Diego, supra*, 45 Cal.2d at p. 572.)

We find further support in the recent case of *Maples v. Kern County Assessment Appeals Bd.* (2002) 96 Cal.App.4th 1007 [117 Cal.Rptr.2d 663]. The property in *Maples* was developed under section 515 of the National Housing Act of 1949 (42 U.S.C. § 1485), an incentive program designed to provide low-income housing in rural areas. In exchange for the owner's agreement to set rents on a "low income" basis for eligible families, the federal government provides favorable financing. Interest on the loan is at market rate, but the owner receives an interest credit that reduces the effective mortgage interest rate to one percent. Profits are restricted to an annual net return of percent on the original equity investment.

The question before the court was whether in capitalizing the property's income, the assessor should use the investor's actual net mortgage interest rate of percent, or the higher market interest rate. The court held the assessor should utilize the actual debt component rate applicable to the specific market at issue—the highly regulated section 515 property market. (*Maples v. Kern County Assessment Appeals Bd., supra*, 96 Cal.App.4th at p. 1016.)

The parallels to our case are strong. Watson's power facility also was developed as a result of government incentives. To encourage development of cogeneration and small power production facilities, the state, through the PUC, approved favorable contracts for qualifying facilities. The assessor considered Watson's income stream based on its favorable, government-facilitated power purchase agreement. This was the type of agreement for the specific market at issue—the qualifying facility power production market. The assessor's use of the actual applicable terms to capitalize the property's income is an appropriate exercise of discretion. (*Maples v. Kern County Assessment Appeals Bd., supra*, 96 Cal.App.4th at p. 1016.)

## DISPOSITION

The judgment is affirmed.

Hastings, J., and Curry, J., concurred.