Filed 10/23/23  Walmart v. County of Placer CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| WALMART INC., | |
| Plaintiff and Appellant, | C096663 |
| v. | (Super. Ct. No. SCV0045355) |
| COUNTY OF PLACER, | |
| Defendant and Respondent. | |

Walmart Inc., brought an action against the County of Placer (County) for refund of taxes paid for a Walmart store located on Lead Hill Boulevard in Roseville (the Lead Hill Walmart).  Walmart challenges the order of the Placer County Assessment Appeals Board (Board) upholding the assessor's valuation of the Lead Hill Walmart.  The trial

court entered judgment in favor of the County, rejecting Walmart's claim that the Board incorrectly valued the property.

Walmart now contends (1) the Board's valuation of the Lead Hill Walmart failed to account for obsolescence as part of the depreciation analysis in applying the cost approach to value, (2) the valuation improperly applied the comparative sales approach to value because it valued the property as if the property is leased even though it is owner-occupied, and (3) the Board and the trial court applied the wrong standard for reviewing the assessor's appraisal.

We conclude (1) Walmart had the burden before the Board to establish that the assessed value was incorrect, and it did not overcome the presumption that the assessor performed her duties properly; (2) the Board did not improperly value the property under the comparative sales approach; and (3) Walmart's challenge is to the application of the value approach rather than to its methodology, and it failed to convince the Board and the trial court that there was additional obsolescence, beyond the depreciation already accounted for, that required adjustment of the Lead Hill Walmart's value.

We will affirm the judgment.

BACKGROUND

This is the second action arising from the Board's opinion denying Walmart's claim for refund of taxes. The Board's opinion related to the valuation of three properties: the Lead Hill Walmart, and also a Walmart and Sam's Club on Pleasant Grove Boulevard in Roseville. In the first action (the Pleasant Grove case), the trial court entered judgment in favor of the County on the Board's valuation of the two Pleasant Grove properties. This court affirmed the judgment. (*Walmart Inc. v. County of Placer* (Oct. 27, 2022, C093835) [nonpub. opn.] (*Walmart I*).) Our opinion in the current action involving the Lead Hill Walmart is similar in many respects to our opinion in *Walmart I* because both actions arise from the same opinion of the Board.

2

## A

The California Constitution provides that, unless exempt, "[a]ll property is taxable and shall be assessed at . . . fair market value." (Cal. Const., art. XIII, § 1, subd. (a).) The county assessor bears the duty to determine the full value of real property for taxation purposes. (Rev. & Tax. Code, § 401.)[1] "Full value" and synonymous terms such as "fair market value" "mean the price at which the unencumbered or unrestricted fee simple interest in the real property (subject to any legally enforceable governmental restrictions) would transfer for cash or its equivalent . . . ." (Cal. Code Regs., tit. 18, § 2, subd. (a).)

Section 3 of title 18 of the California Code of Regulations[2] prescribes valuation approaches and requires the assessor to "consider one or more" of the approaches "as may be appropriate for the property being appraised." (Rule 3.) Generally, the approaches that may be used to value real property are the comparative sales approach (rule 3, subd. (a)), the income approach (rule 3, subd. (e)), and the cost approach (rule 3, subd. (c)).

The comparative sales approach to value relies on "[t]he price or prices at which the property and comparable properties have recently sold." (Rule 3, subd. (a).) This is the preferred approach to value when there is reliable market data. (Rule 4.) The parties both presented evidence to the Board of the sale price of allegedly comparable properties. However, the Board found that "reliable comparable sales were limited for the subject properties and[,] consequently, the comparative sales approach to value was given limited weight by the Board . . . ."

---

[1] Undesignated statutory references are to the Revenue and Taxation Code.

[2] Undesignated rule references are to sections of title 18 of the California Code of Regulations.

The income approach to value reflects "[t]he amount that investors would be willing to pay for the right to receive the income that the property would be expected to yield, with the risks attendant upon its receipt." (Rule 3, subd. (e).) The assessor presented evidence to the Board concerning the income approach, but Walmart did not. The Board found the income approach was unreliable in this case because of limited income data.

In its arguments to the Board, Walmart disclosed that its main reason for appealing the assessed values of the properties was to test whether it is proper to assess property under the comparative sales approach as if there is a lease in place, rather than assessing the real property as if it would be sold vacant. However, Walmart also briefly asserted to the Board that the assessor failed to account for obsolescence in the cost approach.

Having found market data unreliable with respect to the comparative sales and income approaches, the Board relied on the cost approach, discussed in rules 3, subdivision (c) and 6, to determine the value of the Lead Hill Walmart. The cost approach reflects the estimated land value, plus the new cost of improvements, minus depreciation of the improvements, and does not take into consideration whether there is a lease in place. (Rules 3, subd. (c), 6.) More specifically, the cost approach relies on "[t]he cost of replacing reproducible property with new property of similar utility, or of reproducing the property at its present site and at present price levels, less the extent to which the value has been reduced by depreciation, including both physical deterioration and obsolescence." (Rule 3, subd. (c).)

Because Walmart bases its criticism of the Board's application of the cost approach on an alleged failure to account for external obsolescence in the depreciation of the Lead Hill Walmart, we will define external obsolescence. Walmart quoted the definition of external obsolescence applicable to personal property and fixtures in its opening brief. (State Board of Equalization, Assessors' Handbook § 504, Assessment of Personal Property & Fixtures (Oct. 2002) at p. 72.) But we will instead rely on the

4

Assessors' Handbook provisions provided by the State Board of Equalization applicable to real property and improvements.

External obsolescence is a form of depreciation. (State Board of Equalization, Assessors' Handbook, § 501, Basic Appraisal (Jan. 2002) at p. 81.) Also known as economic obsolescence, it is the loss of value caused by adverse factors that are external to the property. (*Id*. at p. 82.) The State Board of Equalization described these adverse factors and their effect: "These external factors usually affect more than one property in the area and cannot be controlled by an individual property owner. External obsolescence may be caused by environmental factors, illustrated by industrial encroachment on a residential neighborhood, or by the shifting of the economic base of employment away from a community. Losses in value attributable to external obsolescence are usually beyond the power of any single property owner to influence and cannot be cured by making changes to the subject improvement." (*Ibid*.)

Again quoting the State Board of Equalization: "External obsolescence (sometimes called economic obsolescence) is a loss in value caused by negative influences outside of the subject property that are generally beyond the control of the subject property owner or tenant. Unlike physical deterioration and functional obsolescence, which are intrinsic to the property, external obsolescence is caused by extrinsic forces. Negative influences could be economic (e.g., erosion of a community's economic base or a building supply that is in excess of demand), locational (e.g., placement of a medical center adjacent to a railroad crossing), or legal (e.g., a zoning variance that allows for industrial uses in a residential neighborhood, or a wetlands protection law that limits construction). The presence and extent of external obsolescence can be identified by examining the overall market conditions of a property. External obsolescence can affect both a site and its improvements. External obsolescence is generally deemed to be incurable as of the valuation date, but may not be permanent."

5

(State Board of Equalization, Assessors' Handbook, § 502, Advanced Appraisal (Dec. 1998) at p. 22, italics omitted.)

B

After the Pleasant Grove and Lead Hill properties were assessed, Walmart paid the property taxes and filed applications for refund with the Board. The applications alleged the assessor failed to properly determine the fair market value of the properties. (§ 1603, subd. (a).) The Board conducted a hearing on the applications, considered oral testimony and documentary evidence, and sustained the assessor's recommended values with written findings. (§ 1611.5.)

Walmart had the burden of proof before the Board to establish by a preponderance of the evidence that the assessor's determination was incorrect. (Rule 321, subds. (a) & (b).) "No greater relief may be granted than is justified by the evidence produced during the hearing." (Rule 321, subd. (f).) The Board presumed the assessor properly performed her duties and imposed on Walmart the burden of overcoming the presumption that the assessments were correct. (Rule 321, subd. (a).) After considering and weighing each party's independent evidence of value, the Board determined Walmart failed to establish by a preponderance of evidence that the assessment was incorrect.

The Board used the cost approach to value, adding together the value of the land and the value of the improvements when the improvements were new and then subtracting for depreciation, giving the Lead Hill Walmart a value of $17,950,000. Walmart argued to the Board that the assessor did not properly account for obsolescence in the depreciation of the properties and asserted that the value of the Lead Hill Walmart under the cost approach was $11,450,000. Nevertheless, the Board sustained the assessor's value, which used the Marshall and Swift depreciation tables to determine depreciation, giving the properties an economic life of 35 years. The Board noted the Marshall and Swift depreciation tables are "a proven statistically reliable depreciation indicator." Thus, the difference between the Board's (and assessor's) valuation of the

6

Lead Hill Walmart ($17,950,000) and Walmart's valuation of the same property ($11,450,000) was $6.5 million.

In relying on the Marshall and Swift depreciation tables, the Board declined to use a study conducted by Walmart concerning depreciation and obsolescence because Walmart's study relied on former Sam's Club stores in Sacramento and La Quinta that were insufficiently similar to the Lead Hill and Pleasant Grove properties. Because that Board determination is critical to the outcome of this action, we quote the Board's reasoning:

"The Board agrees with the Assessor that [Walmart] overstated the depreciation factor in its cost approach. We agree that the Marshall and Swift depreciation tables provide a much more realistic and accepted methodology for depreciation than the [two-property] study used by [Walmart]. The methodology used by Marshall and Swift provides a proven statistically reliable depreciation indicator whereas the [two-property] analysis used by [Walmart] is heavily biased by conditions unique to those two properties and absent in the [Lead Hill and Pleasant Grove] properties. The properties used by [Walmart] were vacant and deed restrictions were recorded against the properties prohibiting the type of use currently enjoyed by the [Lead Hill and Pleasant Grove] properties. The two parcels were also located in inferior locations than the subject properties. Importantly, the [Lead Hill and Pleasant Grove] properties are all located in prime areas of the robust Roseville market[,] a fact that seems to be largely ignored by [Walmart] in its comparison of the [Lead Hill and Pleasant Grove] properties to the former Sam's Club stores in Sacramento and La Quinta. The huge disparity between the Marshall and Swift depreciation tables and the figure provided by [Walmart] suggests one of the studies is flawed. Of the two properties used by [Walmart] in support of its depreciation study, the La Quinta property was calculated to have an economic life of 9.51 years and the Sacramento property was calculated to have an economic life of 12.01 years. [Fn. omitted.] In contrast, as of the event date the [Lead Hill and Pleasant Grove]

7

properties were already 13 years old and being fully utilized. The economic life of 35 years supported by Marshall and Swift for the [Lead Hill and Pleasant Grove] properties is far more appropriate under these facts. The accelerated depreciation and short economic life of the two examples used by [Walmart] are explained by issues unique to those particular properties and are not indicative of a standard trend that can be applied to other sites[,] particularly if the other sites are fully occupied and have already demonstrated a useful life beyond those two properties."

While the parties submitted argument regarding the comparative sales and income approaches, the Board relied on the cost approach. The Board wrote: "Both parties devote substantial argument to the legal issue of how the 'unencumbered fee interest' should be appraised and whether and to what extent comparable sales with existing leases may be used in the appraisal process. While we address that issue in some detail below, *we do not find it necessary to resolve the issue to reach our conclusion in this case*. Here, we accept the premise that reliable sales and income data are limited for the subject properties. Therefore, under these facts, the most appropriate appraisal method is the cost approach under [rules 3, subd. (c) and 6]. The cost approach does not rely upon comparable sales and leases to establish value[,] thus rendering the dispute between the parties discussed [later in the Board decision] to be *largely academic*. While we accept the comparable sales approach to value provided by the Assessor for purposes of reconciling values, we give limited weight to this approach due to the lack of reliable sales data that can be properly compared to the subject properties." (Italics added.)

Based on these and other findings, the Board approved and accepted the assessor's value recommendation for the Lead Hill Walmart.

Walmart filed an action for refund of property tax in the trial court. (§ 5140.) The complaint alleged the properties were incorrectly assessed and that the Board's determinations of the property values exceeded the fair market value. After a bench trial in which the trial court considered the administrative record and oral argument, the trial

8

court issued a ruling and judgment in favor of the County. Walmart filed a notice of appeal from the judgment.

This action involving the valuation of the Lead Hill Walmart diverged from the Pleasant Grove case at the pleading stage in the trial court. In both this case and the Pleasant Grove case, Walmart, in its original complaint, failed to allege any error in the Board's opinion concerning the cost approach to value. (*Walmart I, supra*, C093835.) In the Pleasant Grove case, the trial court rejected Walmart's contentions about the Board's application of the cost approach because, in its complaint, Walmart failed to allege errors in applying the cost approach to value. The trial court also noted Walmart never formally made a motion to amend its complaint to allege errors in the application of the cost approach. On appeal from the trial court's judgment in the Pleasant Grove case, this court agreed with the trial court that the complaint did not allege errors in the application of the cost approach. Therefore, Walmart's failure to allege error in the application of the cost approach and failure to amend the complaint to allege such error required affirmance of the trial court's judgment. (*Walmart I, supra*, C093835.)

Unlike in the Pleasant Grove case, Walmart moved to amend its complaint in this action to allege errors relating to application of the cost approach, and the trial court granted the motion. Therefore, this case involving the Lead Hill Walmart does not include the same pleading defect noted in our opinion in the Pleasant Grove case.

In its respondent's brief on appeal, the County asserts issue preclusion bars relitigation of the property valuation issues because those issues were decided in the Pleasant Grove case. We disagree. Our opinion in the Pleasant Grove case relied on Walmart's failure to allege errors in applying the cost approach. (*Walmart I, supra*, C093835.) But here the amended complaint alleged such errors, and the trial court addressed those allegations in its decision. Consequently, the issues litigated in the Pleasant Grove case are not the same as the issues being litigated in this case. (See

9

*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 [issue preclusion does not apply if issues in prior litigation were not identical].)

Neither party addresses whether this action should be precluded because Walmart filed two different actions challenging the same Board decision (albeit with respect to different properties). We also do not address that question.

DISCUSSION

I

Walmart contends the Board's valuation of the Lead Hill Walmart failed to account for external obsolescence as part of the depreciation analysis in applying the cost approach to value.

The difference between the assessor's application of the cost approach and Walmart's application of the cost approach is that, to determine depreciation, the assessor used the Marshall and Swift depreciation tables, resulting in a depreciation of 22.1 percent, whereas Walmart used its study of the Sacramento and La Quinta properties, resulting in a depreciation of 60 percent for the Lead Hill Walmart.

As Walmart's appraiser, Stephen Roach, acknowledged in his report, "[t]otal depreciation consists of physical deterioration and functional and external obsolescence." He also acknowledged that the Marshall and Swift depreciation tables assign an expected economic life to property similar to the Lead Hill Walmart of "between 30 and 35 years." But Roach claimed that the Marshall and Swift depreciation tables do not "fully reflect functional or external obsolescence." In an attempt to prove his point, he offered the studies of former Sam's Club properties in Sacramento and La Quinta. According to the studies, both buildings were built in 2007 and sold within a few years after that. Based on the data from the Sacramento and La Quinta properties, Roach estimated the depreciation of those properties of about 50 to 84 percent. From that range, he chose 60 percent as the depreciation factor for the Lead Hill Walmart.

10

Roach testified that big-box stores, like Walmart, are highly specialized, with different facades, interior improvements, and configurations. They also have different optimal sizes, so they are not interchangeable. He reported that likely buyers would have to reconfigure the improvements to make them suitable.

Walmart argues it did not rely solely on Roach's study of the Sacramento and La Quinta properties to support its proposed depreciation figure. Walmart's filings to the Board included, in various places, some sales figures concerning big-box stores generally and Walmart properties specifically that were not included in Roach's appraisal. Walmart provided a sales chart of Walmart and Sam's Club properties from 2012 through 2015, including several California properties. According to Walmart, the highest sale price in California was $69.04 per square foot, and the median price in California was $46.51. Walmart also submitted a copy of a private publication addressing big-box valuation methodology in which it was claimed that data from the sale of 740 big-box properties showed the median sale price for big-box properties was $34.40 per square foot. Walmart compares this with the $194.25-per-square-foot assessed value of the Lead Hill Walmart. Elsewhere in its brief, however, Walmart acknowledges the originally assessed value of $27,554,470 on which it based this per-square-foot figure was reduced by the County to $17,950,000.

Walmart asserts on appeal that it proved the existence of external obsolescence using hundreds of properties. But Roach's appraisal discussed only the Sacramento and La Quinta Sam's Club properties in his application of the cost approach. Walmart's inclusion in the record of a sales chart, and its citation to a private publication, did not compel the Board to afford those items significant evidentiary weight.

According to Walmart, the Board completely failed to test for external obsolescence. However, Walmart had the burden before the Board to establish that the assessed value was incorrect, and it did not overcome the presumption that the assessor performed her duties properly. (Rule 321, subd. (a).) The Board appropriately rejected

11

the conclusions of Walmart's appraiser, Stephen Roach, concerning the amount of depreciation because his opinion was based on a study of two properties, the Sacramento and La Quinta Sam's Clubs, that were dissimilar to the Lead Hill Walmart. As the Board explained and as quoted above, the Board examined Roach's appraisal and found it unreliable because of the differences between those two properties and the Lead Hill Walmart. The studied properties were in inferior locations and had not lasted long in business compared to the more long-term existence of the Lead Hill Walmart in the more robust Roseville market area. And the short economic life of the two studied properties (9.51 and 12.01 years) was further proof that those properties were unlike the Lead Hill Walmart, which had already been doing business for 13 years.

Walmart argues the Board misunderstood the nature of obsolescence because it relied on the fact that the property was fully occupied. Walmart cites comments at the assessment appeal hearing, but Walmart does not explain the identity of the speaker or why the comments support its argument.

The challenge to the Board's depreciation analysis lacks merit.

II

Walmart also contends the Board improperly applied the comparative sales approach to value because it valued the property as if the property is leased even though it is owner-occupied.

While the Board based its valuation of the Lead Hill Walmart on the cost approach to value, it also provided its thoughts on what it characterized as the "largely academic" issue of whether, under the comparative sales approach, the Lead Hill Walmart should be compared to similar properties that are under lease. The Lead Hill Walmart is not under lease because it is owner-occupied. The Board gave its reason for engaging in this academic exercise: "Both parties spent considerable time during the hearing and in their briefs addressing their different approaches to value under the comparative sales method

12

and as such we believe it is appropriate to address the issue, even though our decision rests with our findings under the cost approach."

Walmart claims the Board blended the three valuation methods. To support this claim, Walmart cites to a summary of the assessor's analysis, not the Board's conclusions concerning value. Summarizing the assessor's application of the three approaches to value, the Board wrote: "Using the cost approach, the Assessor arrives at a value of $26,535,000. [¶] Using the comparative sales approach as a cross check to her estimated value, the Assessor arrives at a value of $27,800,000. [¶] Using the income approach as a cross check to her estimated value, the Assessor arrives at a value of $26,650,000." (Fns. omitted.) But the Board found the comparative sales and income approaches unreliable because of the limited data available and found the cost approach the most reliable appraisal method. Based on these findings, the Board based its opinion of the Lead Hill Walmart's value on the cost approach, concluding it was worth $17,950,000.

The Board did not blend the valuation methods. It relied on the cost approach. And contrary to Walmart's assertion, the law does not require cross-checking between the different valuation methods. Rule 3 provides that the assessor must consider "one or more" of the value approaches. And rule 6, subdivision (a) states: "The . . . cost approach to value is used in conjunction with other value approaches *and is preferred when neither reliable sales data (including sales of fractional interests) nor reliable income data are available . . . .*" (Italics added.)

Although the Board engaged in an academic discussion about the comparative sales approach and properties under lease, we are not required to do so. Such a discussion would not affect the outcome and hence is beyond the scope of our review. (Cal. Const., art. VI, § 13.) The Board did not improperly value the property under the comparative sales approach.

13

## III

At the end of Walmart's opening brief, Walmart contends the Board and the trial court applied the wrong standard of review. According to Walmart, this case is about the assessor's and the Board's failure to accomplish the third step in applying the cost approach – that is, reduce the value for obsolescence. Walmart asserts the failure to accomplish the third step is error as a matter of law and should be reviewed de novo.

When a taxpayer challenges a valuation *method* used by the assessor, the trial court determines de novo the validity of the method used, as does the reviewing court. However, when a taxpayer challenges the *application* of the valuation method, the trial court reviews the application for substantial evidence, and the reviewing court does too. (*Freeport-McMoran Resource Partners v. County of Lake* (1993) 12 Cal.App.4th 634, 640.)

Concerning the standard of review, the trial court wrote: "Walmart says it is challenging the legal validity of the cost approach that is incomplete because the [assessor] failed to take the mandatory step of determining if obsolescence exists and then adjusting for obsolescence. However, this Court finds that the Board did not skip this step, but weighed both the Assessor's evidence and Walmart's evidence on obsolescence and in its discretion rejected Walmart's evidence. Walmart does not contend[] that the cost approach used by the Board is an invalid methodology but rather that the application of this approach was incorrect, which is an evidentiary issue. Therefore, this Court has used the substantial evidence standard in reaching its decision." (Citing *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828.)

We agree with the trial court. Walmart failed to convince the Board and the trial court that there was additional obsolescence, beyond the depreciation already accounted for, that required adjustment of the Lead Hill Walmart's value. Walmart's contention lacks merit.

14

## DISPOSITION

The judgment is affirmed.  The County is awarded its costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


/S/
MAURO, J.


We concur:


/S/
ROBIE, Acting P. J.


/S/
BOULWARE EURIE, J.